**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

| | |
|---|---|
| JOHN WEST SICKELS,<br><br>　　　　　Petitioner,<br><br>vs.<br><br>DAN CRAIG, Warden of the Iowa<br>Medical and Classification Center,<br><br>　　　　　Respondent. | No. 15-CV-4080-LTS<br><br>**REPORT AND RECOMMENDATION<br>ON PETITION FOR WRIT OF<br>HABEAS CORPUS PURSUANT TO 28<br>U.S.C. § 2254** |

_____

## I.  INTRODUCTION

This matter is before the Court for a decision on the merits of petition for writ of habeas corpus filed by a state prisoner who claims the State of Iowa violated his constitutional rights.  Petitioner, John West Sickels (Sickels), was convicted of second-degree sexual abuse of a bartender, L.S., at a country club.  Sickels was an Assistant Police Chief.  The Police Chief, James Christensen (Christensen) was convicted of second degree sexual abuse of L.S. by aiding and abetting Sickels.

Neither party requested oral argument or an evidentiary hearing, and I find the former unnecessary and the latter inappropriate.  Upon review of the record, and having considered the arguments made by the parties in their briefs, I recommend the district court deny the petition for the reasons set forth below.

## II.  PROCEDURAL HISTORY OF THIS FEDERAL CASE

On September 18, 2015, Sickels filed a petition in the United States District Court for the Southern District of Iowa seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  (Doc. 1).  The case was transferred to the Northern District of Iowa because his

conviction occurred in this district. (Doc. 2). On February 16, 2016, respondent filed an answer to the petition. (Doc. 6). On February 17, 2016, the Court issued a briefing scheduling order (Doc. 8), pursuant to which (after the court granted Sickels three extensions of the deadline), Sickels filed his brief on the merits on August 22, 2016. (Doc. 17). Respondent filed his responsive brief on October 24, 2016. (Doc. 18). After an extension of the deadline, Sickels filed his reply brief on December 26, 2016. (Doc. 22). On December 27, 2016, the court deemed the case ready for decision and the Honorable Leonard T. Strand, United States District Court Judge, referred the matter to me for a Report and Recommendation.

### III.    FACTUAL AND PROCEDURAL HISTORY OF THE STATE CASE

The Iowa Court of Appeals previously summarized the relevant facts of the underlying criminal conduct in this case, which I find accurate upon my own review of the record.

> Starting in July 2006, L.S. worked as a bartender/waitress at a country club. The club manager testified L.S. was dependable, hardworking, and "kind of like my right hand." In April 2008, L.S. was working the Thursday "men's night" shift from 6:00 p.m. until close. By 1:30 a.m., Sickels, Christensen, and L.S. were the only people remaining at the club. Sickels and Christensen had been drinking throughout the evening and L.S. had a drink as her work shift was winding down.

> L.S. and Sickels both testified that while Christensen was present, Sickels asked her to perform oral sex on both men and she said no. Christensen testified he does not remember Sickels making this request. L.S. testified Sickels and Christensen moved behind the bar, cornered her, and Sickels made the same request. L.S. again said no. L.S. stated Sickels left the bar while Christensen kept her behind the bar. In contrast, Sickels and Christensen testified Christensen left the bar to use the restroom and then returned.

2

L.S. testified when Sickels returned to the room he walked behind her and both men began to touch her. L.S. tried to spin around and get away but Sickels and Christensen surrounded her with their arms and moved with her. As Sickels began having sex with L.S., they were all behind the bar and Christensen was beside L.S. with one arm on her shoulder and one arm on the bar. As the assault progressed, Christensen moved to sit in a bar stool directly across from L.S. and stroked her hair, held her hands, and "shushed her." During the assault L.S. verbally protested and cried.

As the two men were leaving, Christensen pointed his finger at L.S.'s face, looked her "straight in the eye and said, 'Nothing happened.'" L.S. interpreted this as a threat: "nothing happened, and if you say something, something, you know, bad will happen. So these are the two chief officers and I just was freaked out . . .." L.S. testified:

> Q. Did you consider running out the front door to get help?
>
> A. No. There's no help out there. . . . I was really, really scared. There's nowhere to go other than out in the parking lot where they are. . ..
>
> Q. Did you consider calling the police?
>
> A. No.
>
> Q. Why not?
>
> A. Because the police just left.
>
> ….
>
> Q. Did you consider calling [your boyfriend] at this point?
>
> A. No.

Q. Why not?

A. Because I wanted to get out of there and go home. . . .
I was just really, really in a state of—I don't know, I
was in shock or something.  I didn't know what to do.
I didn't even finish vacuuming.

….

Q. And you eventually did just go home?

A. Well, I tried to vacuum and I know I sat down after
turning off the vacuum—I kind of sat on the floor next
to it and cried for I don't know how long.  And then I
didn't—I don't even think I wrapped up the cord on the
vacuum cleaner.  I put it where it goes and I went
home.

Sickels testified after he and Christensen left the club around 2:00
a.m., they sat and talked while parked outside of Christensen's house.
Sickels stated they talked about work-related issues and there was no
discussion about events at the country club.

Lesha Clark, the club manager, testified she arrived at the club the
next morning and was surprised to find the club in disarray.   Suzie
Stofferahn, the club bookkeeper/board member, arrived ten minutes later
and also observed the disarray.   Some doors were unlocked, chairs were
not pushed underneath tables, popcorn was left on the floor, tables were not
wiped off, and a check was left "beside the cash register."  Clark described
the condition of the bar area:

There [were] items set on the edge of the bar that were knocked off
into the sink which sits behind the bar.   The straws, the swords, the
toothpicks, they sit in containers on top of the bar and they were strung all
over and dropped in the sink behind the bar . . . .

4

Because Clark was worried about L.S.'s safety, she tried to call L.S. at her school, but she wasn't there. Clark testified L.S.'s boyfriend had subjected her to domestic abuse in the past. Clark wanted to "know if something took place. . . . I didn't have any idea what had happened." Next, Clark called numerous club members and through a series of phone calls discovered Sickels and Christensen had been the last customers. Clark called the police station and eventually talked to Christensen. Christensen confirmed he and Sickels had been at the bar and stated they left together around 1:00 a.m. Over an hour later, Christensen called Clark and stated he had talked to Sickels and he was calling to correct the time they left, it was closer to around 2:00 a.m.

L.S. was not scheduled to work again until the next Thursday evening. Clark asked L.S. to meet her Thursday morning at the club and stated:

> Q. When she comes to the club, what happens?
>
> A. She came into the club and sat down . . . I said, I believe that something happened out here last Thursday night and I need to know. I need to know. I need to be aware if something happened. . . .
>
> ….
>
> Q. Okay. When you're saying this to [L.S] . . . what was her demeanor like?
>
> A. She was upset.
>
> Q. Upset how?
>
> A. She was crying. She was shaking. She was just distraught. . . .

Based on L.S.'s statements, Clark called Stofferahn to come to the club and join the discussion. Stofferahn later told the DCI that L.S. stated

Christensen left the bar for a few moments, not Sickels. At trial, Stofferahn also testified L.S. was upset during the Thursday morning meeting. Clark urged L.S. to contact the authorities and L.S. stated she would think about it. L.S. explained:

> I was scheduled to work that night after [the Clark/Stofferahn] meeting, yes. [Clark] offered for me not to work, and I kind of was trying to get that get-back-on-the-horse attitude, so I said, "I will work, you know. You will be with me the whole night, right?" And she agreed no one would ever work there alone again until close. So I worked and [Clark] stayed with me until close.

L.S. also worked Friday night and Saturday night. After working Saturday, L.S. requested and was granted a leave of absence: "I was having a difficult time being there. I gave it three times and it was not getting any easier. I was feeling really anxious when I was there . . .."

L.S.'s boyfriend discovered her crying in the bathroom after her last Saturday at work and she eventually told him about the sexual abuse. Her boyfriend did online research for resources and L.S. first talked to the Rural Iowa Crisis Center and then to the DCI.

The DCI arranged for L.S. to conduct recorded conversations with Christensen. Meanwhile Christensen and Sickels had meetings with Tom Hartsock, the retired chief of police and their former boss. Hartsock testified: "I recommended to both James Christensen and Johnny Sickels that they should wear a recording device when meeting with L.S." Christensen also recorded the conversations. Christensen testified:

> Q. [D]o you recall [L.S.] formally making an allegation of sexual assault?

> A. She makes a statement similar to that, yes.

> Q. [W]ell, what did she want you to do? Did she want you to investigate further? Did she want John Sickels

6

> > arrested? What . . . did she tell you that she wanted
> > done?
>
> > A. I don't remember the order of events of which requests
> > were made. She did state that she wanted to file a
> > report or have it investigated. I stated I would look
> > into it, but, again, advised her, however, I was there.
> > It did not happen.

Christensen did not contact any authorities about L.S.'s desire to report a sexual assault by his assistant police chief, Sickels. Christensen testified:

> > Q. And, you know, I guess the bottom line is this: Why
> > didn't you call the sheriff? Why didn't you call the
> > county attorney or, I suppose the DCI? Why didn't
> > you do that?
>
> > A. Because it didn't happen.

A few days later, the DCI contacted Christensen. Christensen and Sickels agreed to an interview with the DCI and also met again with the retired police chief before the interview. Christensen and Sickels drove to Des Moines together. The DCI interviewed Sickels and Christensen in different rooms. At first Sickels denied he had sex with L.S. and Christensen told the DCI nobody touched her. Christensen stated he saw Sickels and L.S. behind the bar, but "I never saw any sex act." Sickels had investigated sexual assault-type crimes and asked the DCI about DNA evidence. Sickels testified at trial:

> > Q. And you were asking about DNA because you wanted
> > to know exactly what evidence the DCI had, correct?
>
> > A. No, I would say no to that.
>
> > Q. Then why are you asking about DNA?

7

A. I don't know. I wanted to give myself some time to concentrate, to breathe, and to figure out exactly what I was going to do.

Next, Sickels and Christensen had a private discussion in the parking lot. When they returned to their separate interview rooms after the discussion, Sickels admitted to consensual sexual intercourse with L.S. that started while Christensen left the bar to use the restroom. At trial Sickels testified L.S. became more flirtatious after the other members left and *silently* agreed to have sex with him when Christensen left the room.

After the parking lot discussion, Christensen also changed his story. Christensen told the DCI Sickels had told him for the first time that Sickels had sex with L.S. Christensen also admitted actions and statements consistent with L.S.'s claims, including: Christensen held her hand, what she said, and what Christensen said as he left.

Christensen's trial testimony contradicted his DCI interview statements: he denied holding L.S.'s hand, hearing her protest statements, or saying anything as he left. Christensen explained this change in testimony by stating his statements to the DCI were hypothetical in the context of "is it possible" and anything is possible.

On cross-examination, the DCI tape was played for the jury. After the tape was played, Christensen testified:

Q. Okay. Did [Sickels] tell you all those details about what you did? You walked in, you held her hand, she said, This isn't right. On the way out the door, you said, Don't worry, this didn't happen? Did [Sickels] tell you that in the parking lot?

A. He did not tell me that, no.

Q. So where did you come up with that?

A. I believe it was in the discussion with the [DCI agent].

8

Q. But in this context, [the DCI agent] is not saying is it possible, right? You're talking. Those are your words.

A. Yes.

Q. So once again, how do you explain that you're looking right at the [DCI agent] on tape saying that those are the things that you saw, heard, and did, and yet today you're denying that you saw, heard, or did any of those things?

A. At some point it was discussed already.

Q. Are you suggesting that [the DCI agent] put all that in your mouth or in your head?

A. No.

Q. Where did all this information come from that you're sitting here saying to him?

A. It came from my head.

Q. Okay. So, again, I'm back to the question. Did you hear or see any of those things that you just discussed on this interview?

A. Yes, I did.

Q. Okay. So did you see Sickels having sex?

A. Yes.

Q. And you did come into the room and see that?

A. I did not see sex.

9

Q. You saw movement which you believed to be sex?

A. Yes.

*State v. Sickels*, No. 09–0897, 2010 WL 4792316, at \*1-5 (Iowa Ct. App. Nov. 24, 2010).

Sickels and Christensen were tried together. *Id*. at \*1. Both testified at trial. The jury convicted both defendants. Petitioner appealed his conviction alleging: (1) insufficiency of the evidence; (2) an improper prosecution rebuttal argument; (3) improper exclusion of evidence that L.S. allegedly previously kissed another club member; (4) improper cross examination of Sickels' character witnesses about a specific instance of conduct where Sickels allegedly sexually harassed a bartender at a different bar on a different occasion; and (5) error in the awarding of restitution. *Id*. at \*5-11. The Iowa Court of Appeals affirmed the conviction, but remanded the case for a new restitution hearing. *Id*. at \*11.

Petitioner filed a state post-conviction petition claiming his trial counsel was ineffective because he: (1) should have moved for a trial separate from Christensen; (2) should have more effectively investigated and argued about L.S.'s boyfriend's involvement in the incident and how it influenced L.S.; (3) should have objected to the prosecution using a specific instance of Sickels' conduct to impeach Sickels' character witnesses; and (4) should have done a better job arguing for the admissibility of evidence relating to L.S. allegedly kissing another club patron. *Sickels v. State*, No. 13–1848, 2015 WL 1331321 (Iowa Ct. App. Mar. 25, 2015). The Court of Appeals affirmed the district court's denial of Sickels' state post-conviction petition, finding that "Sickels has not established that his trial counsel was ineffective in any manner." *Id*. at \*6.

10

## IV. STANDARDS FOR SECTION 2254 HABEAS CORPUS RELIEF

"The writ of habeas corpus stands as a safeguard against imprisonment of those held in violation of the law." *Harrington v. Richter*, 562 U.S. 86, 91 (2011). A federal court will not grant a petition for writ of habeas corpus "unless it appears that— (A) the applicant has exhausted the remedies available in the courts of the State [the exhaustion doctrine]; or (B)(i) there is an absence of available State corrective process; or (ii) circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1)(A)-(B). *See also Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (holding that under the AEDPA, a petitioner must exhaust available state remedies). "Before a federal court may grant habeas relief to a state prisoner, the prisoner must exhaust his remedies in state court. In other words, a state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition." *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). The exhaustion doctrine "is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts." *Id.* at 845.

In Iowa, a prisoner must seek review through the "ordinary and established appellate review process," which includes an application for further review in the Iowa Supreme Court. *Welch v. Lund*, 616 F.3d 756, 758–59 (8th Cir. 2010) (internal citation omitted) (holding that an Iowa prisoner failed to exhaust his claims in the Iowa state courts when prisoner's appeal of the state district court's decision to the Iowa Supreme Court was "deflected to the Iowa Court of Appeals" and the prisoner failed to file for further review in Iowa Supreme Court).

Even when a prisoner's claim has been fully adjudicated in state court, a federal court still may not grant habeas relief unless the state court adjudication:

11

(1) [R]esulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) [R]esulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fair-minded jurists could disagree on the correctness of the state court's decision." *Woods v. Etherton*, 136 S. Ct. 1149, 1151 (2016) (*per curium*) (quotations and citations omitted). *See also Nash v. Russell*, 807 F.3d 892, 896 (8th Cir. 2015) (holding that under the AEDPA, a federal court can grant habeas relief only if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.") (quotation and citation omitted).

"Contrary to . . . clearly established Federal law" as referenced in §2254(d)(1) means that the "state court arrive[d] at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "confront[ed] facts that are materially indistinguishable from a relevant Supreme Court precedent and arrive[d] at a result" opposite to that reached by the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 405, 412-13 (2000) (O'Connor, J., concurring and writing for the majority). Circuit "precedent does not constitute 'clearly established Federal law' . . .." *Parker v. Matthews*, --- U.S. ----, 132 S. Ct. 2148, 2155 (2012). Federal courts must be deferential in determining if the state court decision was based on "an unreasonable determination of the facts" as described in §2254(d)(2). "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State

12

court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

The burden is on the petitioner, and it is a heavy one. "The AEDPA standard is difficult to meet as it is intended as 'a "guard against extreme malfunction in the state criminal justice system," not a substitute for ordinary error correction through appeal.'" *Nash*, 807 F.3d at 897 (quoting *Harrington*, 562 U.S. at 102-03, and *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979)).

## *V. DISCUSSION*

Sickels argues he is entitled to relief on the ground that the state court erred in failing to find his trial counsel was ineffective because he failed to: (1) move for a separate trial; (2) properly offer evidence of and argue about the relationship between L.S. and her boyfriend; (3) object to improper character evidence; and (4) effectively argue for admission of L.S.'s prior conduct. I will address each ground in turn. First, however, I will review the standard for habeas review where, as here, a petitioner's argument is based on an assertion of ineffective assistance of counsel.

### *A. Standard of Review Where Petitioner Claims State Court Erred in Failing to Find Trial Counsel Ineffective*

To demonstrate that his counsel was ineffective, a petitioner must show "both deficient performance by counsel and prejudice." *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). Under the *Strickland* standard, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. "A fair assessment of attorney performance

13

requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* Thus, "[a] convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690.

On habeas review, this court's task is not to determine in the first instance whether a petitioner's trial counsel was ineffective. Rather, this court's task is to determine if the state court's decision that trial counsel was not ineffective was contrary to, or involved an unreasonable application of, federal law, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. The operative federal law is the *Strickland* standard. Therefore, on habeas review, a petitioner alleging the state court erred in applying the *Strickland* standard has a heavy burden. As the Eighth Circuit Court of Appeals has explained:

> Taken together, AEDPA and *Strickland* establish a "doubly deferential standard" of review. First, under *Strickland*, the state court must make a predictive judgment about the effect of the alleged deficiencies of counsel on the outcome of the trial, focusing on whether it is "reasonably likely" that the result would have been different absent the errors. The *Strickland* prejudice standard is less demanding than a more-probable-than-not standard, but the difference is "slight and matters only in the rarest case." To satisfy *Strickland*, the likelihood of a different result must be "substantial, not just conceivable." Under AEDPA, we must then give substantial deference to the state court's predictive judgment. So long as the state court's decision was not "contrary to" clearly established law, the remaining question under the "unreasonable application" clause of § 2254(d) is whether the state court's determination under the *Strickland*

standard is unreasonable, not merely whether it is incorrect.  This standard was meant to be difficult to meet, and "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable."

*Williams v. Roper*, 695 F.3d 825, 831 (8th Cir. 2012) (quotations and citations omitted).

### B.     Separate Trials

Sickels alleges the state court erred when it did not find his trial counsel ineffective for failing to move for separate trials.  (Doc. 17, at 27-37).  Sickels argued to the state court that his trial counsel was ineffective for failing to recognize that: (1) a joint trial would result in Christensen testifying that Sickels lied to him about having consensual sex with L.S.; (2) Christensen "would be a very poor witness"; and (3) in a separate trial a damaging recorded conversation between Christensen and the victim would have been inadmissible.  (Doc. 17, at 27-28).

The state district court judge concluded that: (1) there was no evidence that Christensen's attorney "worked with the State in any way"; (2) "[t]he fact that Christensen, the chief of police, would not make a good witness was not known before trial.  It is only speculation to say otherwise"; and (3) the recorded conversation would have been admissible in a separate trial against Sickels as a co-conspirator statement.  (Doc. 7-10, at 730-31).  On appeal, the Iowa Court of Appeals concluded that although Sickels alleged he knew all along that Christensen would make a poor witness and faults his attorney for not asking him, there is no evidence that the defense attorney had reason to believe Christensen would make a poor witness and no explanation for why Sickels did not advise his attorney of his opinion about Christensen.  2015 WL 1331321, at * 2.

For Sickels to prevail on habeas review, he must demonstrate that the Iowa Court of Appeal's decision was contrary to clearly established law, that is the *Strickland*

15

standard, or was an unreasonable application of the *Strickland* standard. It is not enough to show that the decision was incorrect. Here, Sickels does not allege the state court's decision was clearly contrary to the *Strickland* standard; rather, he argues the Court unreasonably applied the standard. I find it did not.

The state court found that Sickels' attorney made a strategic judgment call that the benefits of a joint trial outweighed the risks. 2015 WL 1331321, at *2-3. The state court applied the first prong of the *Strickland* standard when it held trial counsel's performance was not constitutionally deficient because "[c]ounsel's selection of a strategy cannot be considered ineffective assistance simply because it proved unsuccessful." *Id.*, at *3. The application of *Strickland* was not unreasonable. *See Winfield v. Roper*, 460 F.3d 1026, 1041 (8th Cir. 2006) ("Tactical decisions made after a thorough investigation are 'virtually unchallengeable' on appeal."). Sickels' hindsight, 20/20 view of the tactical decision is unpersuasive. Again, even if Sickels' trial attorney was incorrect in his strategy call, and even if the state court was incorrect in finding it was a reasonable strategy call which should, under *Strickland*, be afforded deference, I cannot conclude on habeas review that the state court decision was such a clear misapplication of *Strickland* that Sickels is entitled to relief.

The state court also found Sickels' ineffective assistance of counsel argument lacking because he failed to demonstrate prejudice, even if his attorney's performance was deemed deficient.[1] The state court found the audio recordings between the victim

---

[1] Respondent is of the opinion that the "Iowa Court of Appeals did not rely on a lack of prejudice in dismissing" Sickels' claim. (Doc. 18, at 14). Although the opinion may not be as clear as it could have been, I believe the Iowa Court of Appeals did address the lack of prejudice, albeit the court did not explicitly state that it found none. Nevertheless, I agree with respondent that even if the Iowa Court of Appeals did not decide the case on the prejudice prong, the district court did and the look-through doctrine allows this Court to rely on that decision. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991) (explaining the look-through doctrine).

16

and Christensen would have "quite likely" been admissible in Sickels' trial, even if it had been severed from Christensen's trial because they constituted statements of a coconspirator. 2015 WL 1331321, at *2-3. Again, this was not an unreasonable application of *Strickland*. Sickels argues that "no rational jurist would ever conclude that the co-conspirator exception to hearsay would allow everything Christensen ever said about the case into a separate trial" and argues the state court's interpretation of state law was "a complete failure in legal reasoning." (Doc. 17, at 35). The state court based its conclusion on state evidence law, which this Court cannot review and must assume was correct. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."); *Ellis v. Norris*, 232 F.3d 619, 622 (8th Cir.2000) (federal habeas court must defer to state court's interpretation of state law). Therefore, the only question for this Court is whether the state court's conclusion that Sickels suffered no prejudice, assuming the recording was admissible, was a reasonable application of *Strickland*. It was. It is clear that if evidence would have been admissible in a separate trial, then Sickels could not have suffered prejudice from a joint trial. *United States v. Davis*, 103 F.3d 660, 676 (8th Cir. 1996) ("[A] defendant does not suffer any undue prejudice by a joint trial if the evidence is such that one crime would be probative and admissible at the defendant's separate trial of the other crime.") (citation omitted).

Accordingly, I find Sickels' first ground for relief to be without merit because I do not find that the state court unreasonably applied the *Strickland* standard when it found trial counsel was not ineffective for failing to seek a separate trial.

*C.*      *Relationship Between L.S. and Her Boyfriend*

Sickels alleges the state court erred when it did not find his trial counsel ineffective for failing to elicit sufficient evidence, and properly argue the importance, of the relationship between L.S. and her boyfriend. (Doc. 17, at 38-55). In his state habeas petition, and again before this Court, Sickels asserts that there was more evidence showing the victim to be an alcoholic and the girlfriend of a jealous, violent boyfriend than what trial counsel discovered or presented. Sickels asserts that his trial counsel should have done more to develop and exploit this evidence. Sickels opines that his attorney should have argued that the reason the bar was found in disarray was not because the victim resisted him, but because the victim's boyfriend found the victim in the bar and fought with her in a jealous rage. (*Id.*).

The Iowa Court of Appeals aptly described this argument thus: "Sickels does not contend trial counsel failed to pursue that avenue of defense, but contends he should have done more and pursued it more vigorously and in greater detail." 2015 WL 1331321, at *3. The state court noted that trial counsel "hired an investigator, and extensive depositions were taken and offers of proof made." *Id.* The court noted that there "was no evidence that the boyfriend entered the club on the night of the offense or that he was aware of the [victim's] unfaithfulness . . . ." *Id.* The court also concluded that "trial counsel's argument was forceful, exhaustive, and directed the jury to those facts in the record which supported the defense's strategy." *Id.* Although, again, the state court's opinion is not a paragon of clarity, I interpret the court's opinion as concluding that trial counsel's performance was not deficient in conducting the investigation and arguing the case based on a reasonable strategy given the evidence.

Applying the doubly deferential standard of habeas review of an allegation that a state court erroneously failed to find ineffective assistance of counsel, I again cannot

18

conclude that the state court erred. The state court reasonably applied the *Strickland* standard when it concluded that trial counsel conducted an adequate investigation and made a reasonable strategic decision about how to argue the case based on the available evidence. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. 691.

Although the state court did not address the prejudice prong of the *Strickland* standard, I find that Sickels did not suffer prejudice.[2] Sickels has failed to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. Even if trial counsel would have presented the evidence and made the argument Sickels now, in hindsight, argues was required, at most it would have explained the disarray in which the club was found. The essential defense, that the victim consented to sex with Sickels, would have remained unchanged. This is not a case, in other words, where Sickels is claiming that the victim's boyfriend, not Sickels, raped the victim. Accordingly, whether there was an alternative explanation for why the club was in disarray was at most only marginally beneficial to Sickels. On the other hand, the evidence against Sickels was strong, including testimony from the victim and evidence both Sickels and Christensen lied to investigators. It is pure speculation to conclude that had trial counsel done what Sickels now claims he should have done, that the outcome of the case would have been different.

_____

[2] That the state court did not explicitly address the issue does not prevent this Court from deciding the case on the issue. *See Harrington*, 562 U.S. at 102 ("Under § 2254(d), a habeas court must determine what arguments or theories supported <u>or, as here, could have supported</u>, the state court's decision; and then it must ask whether it is possible fair-minded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court.") (emphasis added).

19

Accordingly, I find Sickels' second ground for relief to be without merit because I do not find that the state court unreasonably applied the *Strickland* standard when it found trial counsel was not ineffective for failing to present different evidence of, or argument regarding, the relationship between the victim and her boyfriend.[3]

### D.    *Improper Character Evidence*

Sickels alleges the state court erred when it did not find his trial counsel ineffective for failing to object to what Sickels argues was improper character evidence.  (Doc. 17, at 55-69).  Specifically, Sickels argues that the state court erred when it failed to find that his trial counsel was ineffective for failing to object to questions posed to Sickels' character witnesses about an incident where Sickels allegedly sexually harassed another waitress.

Referred to as the so-called Twilight Zone incident (after the name of the bar), trial counsel had successfully moved for an order in limine barring the government from presenting evidence that on a prior occasion at another bar, Sickels allegedly sexually harassed a waitress.  2015 WL 133121, at *4.  The trial court had indicated, however, that if Sickels presented evidence as to his character for peacefulness, the court may

---

[3] I note that in his federal habeas brief, Sickels attacks at length the alleged failure of his trial counsel to impeach the credibility of the DCI agent, which Sickels tangentially connects to the trial attorney's alleged ineffective exploitation of the relationship between the victim and her boyfriend.  (Doc. 17, at 44-51).  Sickels argues, essentially, that the DCI agent was complicit in covering up evidence of the victim's boyfriend's conduct, going so far as to allege that the DCI agent erased a recorded interview.  (Doc. 17, at 50).  First, I find this argument based on rank speculation and conjecture, without any factual basis in the record.  Second, Sickels did not make this allegation before the state court, either during his criminal prosecution or in his state habeas action, either directly or indirectly under the guise of an ineffective assistance of counsel argument.  Accordingly, Sickels is procedurally barred from raising this claim for the first time on federal habeas review.

20

permit the state to cross examine the character witnesses as to their knowledge of this prior incident. *Id.*, at *4-5. The trial court indicated that if the state "prosecutors thought that the door had been opened, they were to advise the court before proceeding with evidence of the Twilight Zone incident." *Id.*, at *4.

At trial, Sickels presented two character witnesses. *Id.* On cross examination, without first advising the court, but without objection from Sickels' attorney, the prosecutors asked the witnesses questions about whether they were knowledgeable of facts related to the Twilight Zone incident. *Id.* Sickels claimed his trial attorney was ineffective for failing to object to this cross examination. The Iowa Court of Appeals found otherwise. Apparently, addressing the prejudice prong of the *Strickland* test, the Iowa Court of Appeals relied on the Iowa Rules of Evidence to find that the prosecutors engaged in proper cross examination, concluding that "[t]he objection, if made, would have been overruled." *Id.* The state court also noted that the trial court instructed the jury that questions by counsel were not evidence, and specifically instructed the jurors that questions about the Twilight Zone were to be considered only for purposes of impeachment, and not as substantive evidence. *Id.* at *5. In addressing the performance prong of the *Strickland* test, the Iowa Court of Appeals noted that "counsel cannot anticipate opposing counsel's question and object to it, nor can the court rule on it, until it has been verbalized." *Id.* at *4. The Iowa Court of Appeals also found that trial counsel made a strategic decision that questions about the Twilight Zone incident would not impact the character witnesses' testimony. *Id.* at *5.

I find that the state court did not erroneously apply the *Strickland* standard to this issue. Sickels appears to fundamentally misunderstand the distinction between a ruling barring the direct admission of evidence of the Twilight Zone incident with permissible questions of witnesses about the incident made not as substantive evidence, but solely for

21

the purpose to impeach character witnesses. In any event, the Iowa Court of Appeals found this was proper under the Iowa Rules of Evidence. On habeas review, this Court cannot second-guess the state court's ruling based on state rules. *Estelle*, 502 U.S. at 67-68. Therefore, the state court properly applied *Strickland's* prejudice prong to find that Sickels was not prejudiced, even if his trial counsel's performance was deficient.[4]

I also find the state court properly applied *Strickland's* performance prong in finding trial counsel was not ineffective. Trial counsel made a strategic decision not to object because he believed questions about the Twilight Zone incident would not shake the character witnesses' testimony. (Doc. 7-10, at 637-69, 730). A trial attorney's strategic decisions are virtually unassailable under the *Strickland* standard. Here, I find the state court reasonably applied the *Strickland* standard to find trial counsel's performance was not constitutionally deficient.

Accordingly, I find Sickels' third ground for relief to be without merit because I do not find that the state court unreasonably applied the *Strickland* standard when it found trial counsel was not ineffective for failing to object to the prosecutor asking questions about the Twilight Zone incident of character witnesses for the purpose of impeachment.

### E. Victim's Conduct (the so-called "Downey Incident")

Sickels alleges the state court erred when it did not find his trial counsel ineffective for failing to more effectively argue the admissibility of prior conduct by the victim with

---

[4] Sickels places great emphasis on the prosecutor's failure to first advise the trial court before asking the questions. (Doc. 17, at 58-59, 66). Although the prosecutor clearly failed to comply with the trial court's directive, Sickels is unable to show any prejudice arising from this where, as here, the questions were permissible. In other words, Sickels cannot show that the outcome would have been different if the prosecutor had first advised the court of the intent to ask the question.

22

another club member on a prior occasion. (Doc. 17, at 69-78). Specifically, Sickels argues that his trial counsel did not "effectively frame and argue" a motion to admit evidence of an incident where Sickels claims the victim made false statements about her sexual conduct.

Approximately a year prior to the incident at issue, the victim had allegedly sat on a customer's lap after the club closed and kissed the customer both in the bar and in the parking lot afterwards. 2015 WL 1331321, at *5. The state filed a motion to bar admission of this evidence under Iowa's rape-shield law. *Id*. The trial court found the evidence inadmissible under Iowa law. *Id*. On direct appeal, the Iowa Court of Appeals affirmed the trial court's ruling. *Id*. Sickels raised the issue again in his state habeas petition. The Iowa Court of Appeals found it was barred as res judicata. *Id*. Alternatively, the Iowa Court of Appeals found the argument without merit. *Id*., at *6.

In his federal habeas petition, Sickels doggedly pursues this same claim, asserting all of the state courts erroneously interpreted a prior state case, *State v. Albert*, 722 N.W. 2d 402 (Iowa 2006), which he claims shows the evidence was admissible. Sickels argues, therefore, that his trial counsel was ineffective for failing to persuade the trial court that *Albert* mandated admission of the evidence. Although the Iowa Court of Appeal's decision does not explicitly address the *Strickland* prongs in relation to this claim, it did conclude the evidence was properly barred under state law. This is, therefore, a finding that Sickels was not prejudiced.

This Court cannot on habeas review reverse a conviction when the state court's ruling is based on an interpretation of state law. *Foster v. Chatman*, 136 S. Ct. 1737, 1745 (2016) (holding that a federal court "lacks jurisdiction to entertain a federal claim on review of a state court judgment if that judgment rests on a state law ground that is both independent of the merits of the federal claim and an adequate basis for the court's

decision.") (internal quotations marks and citations omitted). Here, the state court found this claim barred by res judicata. That is an adequate state ground. *Id.* at 1745-46.

Alternatively, I do not find that the state court unreasonably applied the *Strickland* standard. The state court found the evidence properly barred based on state law. Again, federal courts on habeas review cannot second guess a state court's application of state law. *Estelle*, 502 U.S. at 67-68. Moreover, although the state court did not address the performance prong of *Strickland*, I find no basis for concluding that trial counsel's performance was constitutionally deficient. Trial counsel resisted the state's motion in limine. When the trial court ruled against Sickels, trial counsel made an offer of proof to preserve the issue on appeal. (Doc. 7-10, at 208-33). Sickels apparently believes trial counsel was ineffective because he somehow should have been able to persuade the trial court that the evidence was admissible. When two Iowa Courts of Appeal have found otherwise, it is impossible for this Court to find trial counsel's performance was deficient.

Accordingly, I find Sickels' fourth ground for relief to be without merit because I do not find that the state court unreasonably applied the *Strickland* standard when it found trial counsel was not ineffective for failing to more effectively resist the state's motion in limine.

### F.    *Cumulative Error*

Sickels makes a passing reference in the penultimate sentence of his opening brief to the effect that the court should consider the cumulative effect of the alleged error. (Doc. 17, at 80) ("Whether the Court considers the prejudice in the failures separately or in combination, the Court's confidence in the outcome must be undermined."). Cumulative error analysis is generally not available. *Wainwright v. Lockhart*, 80 F.3d 1226, 1233 (8th Cir. 1996). This Court has previously held, however, that when a habeas

24

petitioner argues that his counsel was ineffective in several related instances, the court may consider the cumulative effect of the instances together. *Johnson v. United States*, 860 F. Supp. 2d 663, 765 (N.D. Iowa 2012).

In this case, I find that the allegations of ineffective assistance of counsel are not sufficiently related for their cumulative effect to be considered. Sickels' claim that his trial counsel should have moved for separate trials is not related to his claim that his lawyer should have presented better evidence of, and presented a better argument regarding, the relationship between L.S. and her boyfriend. Nor are either of those arguments related to Sickels' argument that his trial attorney was ineffective for failing to object to improper character evidence. Nor are any of these related to his claim that his trial attorney should have made a better argument for obtaining admission of the victim's prior conduct. Even were I to find these alleged instances of ineffective assistance of counsel related, I would find that they do not separately or even combined rise to the level of constitutional error requiring relief on habeas review.

## VI.    CONCLUSION AND RECOMMENDATION

For the reasons set forth above, I find the state court's decision that petitioner was not denied effective assistance of counsel was not contrary to, or involved an unreasonable application of, federal law. Therefore, I recommend that petitioner's habeas corpus petition be **dismissed with prejudice**.

Objections to this R & R must be filed within fourteen (14) days of the service of a copy of this R & R. 28 U.S.C. § 636(b)(1), Fed. R. Civ. P. 72(b). Objections must specify the parts of the R & R to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. 72. Failure to object to the R & R waives the right to *de novo* review by the district court of any portion of the

R & R as well as the right to appeal from the finding of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**IT IS SO ORDERED** this 24th day of February, 2017.

_____
C.J. Williams
Chief United States Magistrate Judge
Northern District of Iowa